UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

J. TODD WALTERS,                      :
    Plaintiff,                    :
                                  :
v.                                    :          3:10 cv 647 WWE
                                  :
GENERATION FINANCIAL MORTGAGE,        :
LLC and AMSTON MORTGAGE CO.,          :
INC.,                                 :
    Defendants.                   :

## MEMORANDUM OF DECISION ON DEFENDANTS' MOTION TO DISMISS

Plaintiff J. Todd Walters asserts claims of breach of contract, breach of the covenant of good faith and fair dealing, fraud, violation of Connecticut General Statutes § 31-51q, violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), and breach of fiduciary duty against defendants Generation Financial Mortgage, LLC ("Generation") and Amston Mortgage Company, Inc. ("Amston").

Defendants have moved for summary judgment on all counts. For the following reasons, defendant's motion will be granted in part and denied in part.

## BACKGROUND

The parties have submitted statements of facts and exhibits that reveal the following factual background.

Plaintiff founded Amston, a reverse mortgage company based in Connecticut, in 1996. He held the position of President and Chief Executive Officer. Amston originated and sold reverse mortgages to senior citizens in Connecticut, Maine, New Hampshire, Massachusetts, Rhode Island, New York, New Jersey, Florida, Tennessee, Maryland and Pennsylvania. A reverse mortgage is a financial instrument that allows individuals to access the equity in their

home by borrowing money in exchange for the satisfaction of the debt upon a future sale of the property.

In 2005 or 2006, plaintiff began to discuss with Joe Morris the possible acquisition of Amston by Generation.  At that time, Generation was not yet a functioning company, but Morris eventually became President and CEO of Generation.  Morris explained to plaintiff that he was going to start a reverse mortgage company.  He wanted plaintiff to be a part of it.  Amston was based on the East Coast and had licences that Morris thought would be helpful.  Plaintiff was interested in selling because he thought it would be exciting to be part of a bigger company and, in particular, he thought the ability to service loans would give the proposed new company a competitive advantage.

After a couple of conversations with Morris regarding a possible acquisition of Amston, plaintiff met with Jeff Lewis, Senior Managing Partner of Guggenheim Partners, the company that established Generation.  The meeting occurred at Guggenheim's offices in New York City in July 2006.  At the meeting, Lewis, Morris, and plaintiff discussed the overall plan to start Generation.  The plan was to buy several loan origination brokers and consolidate them into one entity, which would not only originate loans, but also service and underwrite them.

A few weeks after the meeting in New York, Morris and Lewis visited plaintiff at his office in Connecticut.  By then, plaintiff had discussed the acquisition of Amston with his attorney, Elaine Stuhlman, who had formed Amston.  She was involved in the acquisition process from that point on.

In August 2006, the parties began discussing a price for Amston, and ultimately, the parties agreed to compensate plaintiff with a $2 million purchase price, a 5-year employment

2

contract, and 3500 B units (shares) in Generation totaling 3.5% of the company.  As part of the negotiation of the stock purchase agreement, plaintiff's attorney and an attorney for Generation negotiated plaintiff's employment agreement with Generation.  The parties agreed to a five-year employment contract, severance arrangements in the event that the agreement was terminated prematurely, and provisions for selling and purchasing membership units in the event of a termination of plaintiff's employment.

At the time of the acquisition, plaintiff did not know how much his units were worth. Morris had told him that, in his opinion, the units could be worth roughly $3.5 million in a year or two, based on an estimated company worth of $100 million, and perhaps more.  Plaintiff viewed Morris' opinion not as a guarantee, but as a reasonable assumption based on business conditions as they existed at the time.

Plaintiff, as President of the Amston subsidiary, was to run the existing Amston operations and expand it to other East Coast states.  The West Coast was being covered by another subsidiary of Generation.

Around the time that Generation acquired Amston, it was developing plans to create a national call center to increase revenues by selling more loans.  The building of the call center was consistent with industry direction at the time.  While Amston loan officers worked off referrals from people in the business community, the national call center focused on purchasing leads from lead generators.

Plaintiff learned of the national call center in a meeting in Atlanta with Morris.  That same day, plaintiff met Brandon Smith, who was to run the national call center.  Plaintiff's reaction to the call center was negative because he doubted Smith's sincerity and because he felt

that the call center would be in direct competition with his Amston business.  While plaintiff was not comfortable with Smith's plans for the call center, he did think that a national call center was a good idea, especially if it worked with the sales force to provide leads to loan originators.

It was contemplated by Generation that the call center would both generate sales leads and close loans.  Eventually, internet inquiries were directed to the national call center instead of Amston.

Plaintiff repeatedly complained to multiple people within Generation about Smith and the role of the national call center as an intra-company competitor.  Plaintiff also complained about legal compliance problems within the call center.  Plaintiff's colleagues in other regions, such as Rich Young in Sacramento and Mike Atwell in Denver, also become concerned as the call center's practices began to affect their business negatively.

Plaintiff believed that Generation began putting more marketing dollars into the national call center instead of retail operations like his, Atwell's and Young's, which he believed to be inequitable.  In 2009, Amston's marketing expenditures decreased, but so did expenditures for the national call center and corporate.  Total marketing expenditures went down in from almost $2.5 million in 2008 to $1.8 million in 2009.

Generation management decided to terminate plaintiff's employment based on his lack of production.  According to plaintiff, he was first told about the termination sometime in October 2009.  He was verbally notified that his last day of employment would be December 19, 2009.  In the meantime, plaintiff was instructed to terminate a number of his employees.

On November 20, 2009, Generation gave plaintiff a letter confirming the termination of his employment.  The letter stated that plaintiff's employment was being terminated because of a

4

36% drop in average monthly loan value from the previous year.

Plaintiff responded by letter from his attorney on November 30, 2009, indicating that plaintiff had good reason to resign under the employment agreement and granting Generation an appropriate amount of time to cure.  Generation replied to plaintiff's response by asserting that plaintiff had effectively resigned for good reason.

On April 23, 2010, counsel for Generation sent plaintiff notice that he had an opportunity to require Generation to purchase his 3,500 B units, which he failed to exercise, and that Generation would exercise its option to purchase those units at 10 cents per unit, for a total of $350.  Plaintiff denies that Generation maintained such a right.  On May 10, 2010, Generation sent plaintiff a check for $350, noting that plaintiff had failed to dispute its assessment of fair market value despite being required to do so within ten days of the April 23 letter.

The parties dispute the fair market value of plaintiff's units.  Defendants assert that when it tendered $350 for the units, $38 million in capital contributions and preferred returns exceeded the value of the company, rendering plaintiff's units essentially worthless.  Plaintiff argues that the company's value ranged from $45 to $70 million, if not more.

Generation is not a publicly traded company, so its unit holders cannot sell on the open market.  The sale of Generation would set the value of the company for purposes of redeeming units.  Generation has received offers for the company, but a sale was never consummated.  The most recent sales process for Generation resulted in three offers, $25 million being the highest.  Previous offers peaked near $40 million.  For B unit holders to receive any distribution from a sale of Generation, the purchase price would need to approach the high $30 million range.

## DISCUSSION

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991).

The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute.  American International Group, Inc. v. London American International Corp., 664 F.2d 348, 351 (2d Cir. 1981).  In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

If a nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, then summary judgment is appropriate. Celotex Corp., 477 U.S. at 323.  If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. Anderson, 477 U.S. at 249.

**Count I: Breach of the Employment Agreement**

By letter dated November 20, 2009, defendants notified plaintiff of the grounds for his termination.  The letter indicated that plaintiff had failed to substantially perform his reasonably assigned material duties to the company, as evidenced by a 36% drop in average monthly loan value from the previous year.  Moreover, the letter stated that such failure is grounds for termination for cause as defined by section 4(g)(i) of the employment agreement.  It provides:

(i) "Cause" shall include any of the following grounds for the Company's termination of the Executive's employment:

(1) The Executive shall have been convicted or indicted of a felony or plead nolo contendere to any crime involving moral turpitude or any felony;

(2) The Executive knowingly participates in an act of fraud or dishonesty, whether in the past or in the future, against the Company, Generation or any parent, Subsidiary or Affiliate of the Company (including any such acts occurring prior to the date of this Agreement);

(3) The Executive is materially sanctioned by a state or federal agency the result of which is that he is unable to conduct activities in the reverse mortgage business;

(4) The Executive continually fails to substantially perform his reasonably assigned material duties to the Company (other than a failure resulting from the Executive's incapacity due to physical or mental Disability) as reasonably determined by the President of the Generation, which failure (A) has continued for a period of at least ten (10) days after a written notice of demand for substantial performance has been delivered to the Executive specifying the manner in which the Executive has failed substantially to perform, and/or (B) the Executive unreasonably allows the situation to recur following the giving of such notice;

(5) The Executive engages in willful misconduct in the performance of his duties; or

(6) The Executive breaches in any material manner any provision of this Agreement, the Purchase Agreement, or Company policy, provided written notice of such breach has been delivered to the Executive specifying the manner in which the Executive has breached this Agreement, the Purchase Agreement or Company policy, and which breach has not been cured ten (10) days after written notice of breach has been delivered to the Executive.

Defendants argue that plaintiff failed to substantially perform reasonably assigned material duties pursuant to section 4(g)(i)(4). Defendants do not specify how plaintiff failed to perform or which material duties he neglected but instead assert that his failure was "evidenced" by a 36% drop in average monthly loan volume.

Defendants also maintain that plaintiff violated the agreement's "best efforts" provision at section 3(b)(i).  It provides:

> The Executive shall endeavor to enhance and develop the interests and welfare of the Company, and devote substantially all of his professional time and attention to the Company and its Business.

Defendants argue that plaintiff was required to enhance and develop the interests and welfare of Generation and that plaintiff's failure to "improve Amston's sales numbers" constitutes cause for termination.  However, the employment agreement does not require plaintiff to enhance and develop the interests and welfare of Generation.  Rather, section 3(b)(i) mandates that plaintiff *endeavor* to do so.  Moreover, the agreement does not set loan value benchmarks or requirements.  As discussed above, defendants have yet to identify specifics of how plaintiff failed to perform or which material duties he neglected.  Indeed, both CEO Joseph Morris and Chairman Jeffrey Lewis were unable to testify to a single specific action by plaintiff that caused the drop in loan volume cited as the cause for plaintiff's termination.

The employment agreement did not make plaintiff guarantor of the division's results regardless of outside factors.  Moreover, Richard Young, then manager of the West Division of Generation, stated under oath that Mr. Lewis decided to terminate plaintiff's employment at the end of 2008, when plaintiff had the highest loan volume of any region.

Plaintiff's performance is a disputed issue of material fact.  Moreover, where defendants are accused of taking affirmative steps to undermine plaintiff's productivity, mere under-performance, which is not listed within the definitions of cause, cannot form the basis of summary judgment in favor of defendants on the breach of contract count.

As an alternative basis for granting summary judgment, defendants contend that plaintiff

8

was not terminated because, instead, he resigned by letter from his attorney dated November 30,

2009.  The letter was not a letter of resignation, but a notice to defendants of plaintiff's belief that

he had "good reason" to terminate the agreement.  Indeed, the letter concludes:

> Mr. Walters does not wish to terminate at this time, rather Mr. Walters has
> agreed to grant the Company an appropriate time to cure.

> Mr. Walters will continue to perform pursuant to the subject Employment
> Agreement.

Defs.' Ex. 10.  Accordingly, plaintiff did not resign.  Summary judgment will be denied as to

Count I.

### Counts II and III: Breach of Good Faith and Fair Dealing

"Every contract carries an implied covenant of good faith and fair dealing requiring that

neither party do anything that will injure the right of the other to receive the benefits of the

agreement."  Gaudio v. Griffin Health Services Corp., 249 Conn. 523, 564 (1999).

Count II alleges breach of the covenant of good faith and fair dealing regarding plaintiff's

employment contract.  Count III alleges the same breach in conjunction with the sale of Amston

to Generation.

Defendants begin by arguing that plaintiff's good faith claims are "ridiculous" as no

company would intentionally sabotage its business just so it could get rid of a single employee.

Plaintiff argues that defendants systematically campaigned to impair his and his

division's ability to enhance the company's business.  Indeed, defendants acknowledge that

plaintiff's colleagues in other regions, such as Rich Young in Sacramento and Mike Atwell in

Denver, also became concerned that Defendants' national call centers were negatively affecting

their loan volumes.  Defendants state that, "[t]o be fair, there were arguably difficulties in

integrating the [national call centers] into the existing retail framework of Generation."

Defendants go on to argue that to the extent that the national call centers did not work for all, it was clearly not a [plaintiff]-centric failure.  Defendants assert that while these "were business decision that did not pan out, they were most certainly not decisions directed to firing [plaintiff]."

In summary, defendants argue that plaintiff's unhappiness with certain business decisions that defendants made do not add up to a breach of good faith and fair dealing.

Plaintiff does not contend that defendants sabotaged its own business.  Rather, plaintiffs good faith and fair dealing claims revolve around allegations that defendants intended to and did blame plaintiff for failures beyond his control so that defendants could terminate plaintiff to avoid fully compensating him under the employment agreement and to call his units at an inadequate price.  According to plaintiff, bad faith was demonstrated through defendant's counterfeit determination that cause for termination existed for issues unrelated to any failure of plaintiff to perform his job functions.

The Supreme Court of Connecticut has held that Connecticut law does not recognize a good faith limitation on the power to discharge an at-will employee because it "would write into every hiring of indefinite duration a provision requiring good cause for termination."  Magnan v. Anaconda Industries, 193 Conn. 558, 567 (1984).  In other words, termination of an at-will employee absent cause is not evidence of bad faith.  Here, however, where plaintiff and defendants agreed to a five-year term of employment and required good cause for termination, the good faith rule should operate as designed - "to fulfill the reasonable expectations of the contracting parties as they presumably intended."  Id.

"The covenant of good faith and fair dealing presupposes that the terms and purpose of

the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term." Hoskins v. Titan Value Equities Group, Inc., 252 Conn. 789, 793 (2000). Here, plaintiff argues that defendants knew they had no legitimate basis to terminate plaintiff's employment and only did so to avoid paying under the employment agreement and to buy back plaintiff's units at a grossly unfair price. In other words, defendants applied or interpreted the terms of the agreement in bad faith for the purpose of impeding plaintiff's right to the benefit of the bargain. That no company would intentionally sabotage its business just so it could get rid of a single employee is simply not material where plaintiff has made no such general allegation. Defendants, through their appeal to logic, fall short of meeting the burden on the moving party of demonstrating the absence of any material factual issue genuinely in dispute.

"Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive.... Bad faith means more than mere negligence; it involves a dishonest purpose." De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., 269 Conn. 424, 433 (2004). Here, whether defendants harbored a dishonest purpose in refusing to fulfill their contractual obligations is a material factual issue genuinely in dispute. The dispute extends both to plaintiff's employment contract and to the acquisition of plaintiff's company. Although defendants assert that Counts II and III are the same since both speak to Generation's termination of plaintiff's employment and the events leading up to it, plaintiff also sold his business to defendants. That transaction was related to but separate from plaintiff's employment agreement. Accordingly, summary judgment

11

will be denied as to counts II and III.

**Count IV: Fraud**

Defendants do not make separate arguments regarding plaintiff's fraud claim but refer to it as a mishmash of bad faith Counts II and III.  Defendants contend that, essentially, the three claims together stand for the proposition that Generation intended from the outset of its relationship with plaintiff to terminate his employment and avoid making payments to him under his employment agreement.  Defendants again respond that, "[t]here is no evidence to suggest that Generation made ruinous business decisions just so it could fire [plaintiff] for cause and not pay him any severance."

For purposes of the bad faith claims, intent need not be premeditated.  In other words, defendants could have initially intended to fulfil their obligations from the outset but changed course during the life of the agreements.  Fraud, in contrast, requires the intent to induce reliance at the time the false representation was made:

> Fraud consists in deception practiced in order to induce another to part with property or surrender some legal right, and which accomplishes the end designed.... The elements of a fraud action are: (1) a false representation was made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was made with the intent of inducing reliance thereon; and (4) the other party relied on the statement to his detriment.

Weinstein v. Weinstein, 275 Conn. 671, 685 (2005).

Here, plaintiff's fraud claim is based on the idea that Generation falsely represented that upon the sale of his business, plaintiff would be granted an interest in Generation, which interest would compensate him for the transfer of Amston.  Moreover, plaintiff asserts that Generation never intended to allow plaintiff to participate in the sale of Generation to a third party and that

plaintiff relied on the false representations of Generation management when he agreed to take less than fair market value for his business.

Defendants argue that they did not intend to mislead plaintiff about the value of the company when they estimated its potential sale price at $100 million or more.  Defendants contend that plaintiff did not view the $100 million number as a guarantee, but as a reasonable assumption based on the business conditions as they existed at the time.  Nevertheless, valuation guarantees aside, plaintiff sold Amston in consideration for the five-year employment contract and the ability to participate in a future sale of the company via plaintiff's 3,500 B units.  Again, while plaintiff does allege that defendants sought to harm *his division*, he has not alleged that they endeavored to ruin the business as a whole.

As discussed above, whether plaintiff was unjustifiably terminated and/or stripped of his units are disputed issues of material fact.  Whether defendants made false representations with the intent of inducing plaintiff's reliance so that they could acquire Amston at a reduced price is similarly in dispute.  Accordingly, summary judgment will be denied as to Count IV.

**Count V: Violation of Connecticut General Statutes § 31-51q**

Plaintiff does not oppose defendants' motion for summary judgment on the Section 31-51q claim.  Accordingly, summary judgment will be granted for defendants as to Count V.

**Count VI: Connecticut Unfair Trade Practices Act**

Count VI alleges unfair acts or deceptive practices within the meaning of Conn. Gen. Stat. § 42-110(b)(a) in the conduct of trade or commerce.  To prevail on a CUTPA claim, the plaintiff must show a prohibited unfair act by the defendant that was the proximate cause of harm to the plaintiff.  Scrivani v. Vallombroso, 916 A.2d 827, 832 (Conn. App. 2007).

13

In determining what constitutes an unfair act, Connecticut courts are guided by the Federal Trade Commission's cigarette rule, which considers:

> (1)[W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons].... All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three.

Updike, Kelly and Spellacy, P.C. v. Beckett, 269 Conn. 613, 655-56 (2004).

Defendants first argue that Generation could not have been trying to eliminate a competitor because Generation was based on the West Coast while Amston was based on the East Coast of the United States.

Second, defendants argue that they paid plaintiff the agreed-upon consideration for the sale of Amston. Specifically, defendants assert that "Generation and [plaintiff] negotiated a stock purchase agreement and an employment agreement, and Generation paid [plaintiff] the $2.0 million it promised him, gave him the 3,500 B units it promised him, and employed him as it promised." Moreover, defendants argue that a breach of contract alone does not create a viable CUTPA claim.

Whether Generation acquired Amston because Amston was viewed as a competitor is not dispositive of plaintiff's CUTPA claim. Nevertheless, plaintiff contends that Generation planned to operate and did operate a national call center virtually from the date of plaintiff's sale of Amston, so competition was inevitable. More importantly, plaintiff argues that as a result of

defendants' breach of the duty of good faith and fair dealing and their fraud, plaintiff has been deprived of twenty-nine months of compensation under the employment agreement, and his units were taken from him for a pittance ($350), both of which clearly constitute substantial damage. As plaintiff's allegations encompass the unfair, unscrupulous and injurious acquisition of his company, this is not a mere breach of contract claim. Indeed, all three of the cigarette rule's criteria come into play.

Resolving all ambiguities and drawing all reasonable inferences against defendants, the Court finds that plaintiff has adequately supported a finding of CUTPA violation at the summary judgment stage. Accordingly, summary judgment will be denied as to Count VI.

**Count VII: Breach of Fiduciary Duty**

Count VII alleges that Generation owes a fiduciary duty to plaintiff as a unit holder and that, by offering a grossly unfair value for plaintiff's units in Generation, Generation violated its fiduciary duty to plaintiff.

Defendants argue that plaintiff cannot prove a fiduciary relationship between him and Generation. Defendants also maintain that the employment agreement, which was negotiated for plaintiff by his attorney as part of the sale of his business, granted Generation a purchase option, gave it the right to set the fair market value of plaintiff's units at its discretion, and provided plaintiff an appeals process if he disagreed with the fair market value. Under the circumstances, defendants argue that the parties were certainly not in a confidential relationship characterized by a unique degree of trust and confidence. See e.g. Saye v. Old Hill Partners, Inc., 478 F. Supp. 2d 248, 270 (D. Conn. 2008). Finally, defendants argue that the real proof of valuation for a privately held company like Generation is how much someone is actually willing to pay for it - in

other words - "[plaintiff's] shares are worth precisely what Generation valued them at," ($350).

Fair market value is not equal to the price the buyer is willing to pay when the seller is obligated to sell. "In general, the term 'fair market value' is understood to mean 'the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.'" Gudmundsson v. U.S., 634 F.3d 212, 221 (2d Cir. 2011) (quoting U.S. v. Cartwright, 411 U.S. 546, 551 (1973)).  Nevertheless, plaintiff has not demonstrated that Generation owed him a fiduciary duty.

Both sides base their fiduciary relationship arguments on the law of corporations. However, Generation, in whose units plaintiff asserts an interest, is a Delaware limited liability company, not a corporation.  The LLC is an unincorporated form of business, which, other than providing limited liability to its owners, shares few structural traits with the more traditional corporate entity.  In Delaware, LLCs are governed by the Limited Liability Company Act, 6 Del. C. § 18-101 *et seq.*

The Delaware General Assembly recently amended Section 18-1104 the Act.

> [Section 18-1104 was amended] to confirm that in some circumstances fiduciary duties not explicitly provided for in the limited liability company agreement apply.  For example, a manager of a manager-managed limited liability company would ordinarily have fiduciary duties even in the absence of a provision in the limited liability company agreement establishing such duties.  Section 18-1101(c) continues to provide that such duties may be expanded, restricted or eliminated by the limited liability company agreement.

H.B. 126, 147th Leg. Assemb., (Del. 2013) (synopsis).  This clarification of the law responded to the Delaware Supreme Court's suggestion that the General Assembly "may be well advised" to

resolve any statutory ambiguity on the issue of fiduciary duties between LLC members.  <u>Gatz Properties, LLC v. Auriga Capital Corp.</u>, 59 A. 3d 1206, 1219 (Del. 2012).  Accordingly, silence within the company agreement on the issue of fiduciary duty among LLC members now creates certain duties.  Notwithstanding, the recent statutory amendment to Section 18-1104 did not extend a fiduciary duty to the LLC entity itself.  Moreover, plaintiff has not demonstrated any basis for extending such a duty through case law, Generation's limited liability company agreement or otherwise.  As no individual members are named as defendants in this case, summary judgment will be granted for defendants as to Count VII.

## <u>CONCLUSION</u>

For the foregoing reasons, defendants' motion for summary judgment is GRANTED in part and DENIED in part.  Summary judgment is GRANTED as to Counts V and VII.  Summary judgment is DENIED as to Counts I - IV, and VI.

Dated this 5th day of December, 2013, at Bridgeport, Connecticut.


_____/s/_____
WARREN W. EGINTON
SENIOR UNITED STATES DISTRICT JUDGE

17